ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2026-Jan-30 20:01:42
60CV-26-1308
C06D14 : 22 Pages

## THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## CIVIL DIVISION

**J.H.**                                                              **PLAINTIFF**

v.

**CORPORATION OF THE PRESIDENT OF THE
CHURCH OF JESUS CHRIST OF LATTER-DAY
SAINTS AND SUCCESSORS; CORPORATION OF
THE PRESIDING BISHOP OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS; and JOHN DOE
DEFENDANTS 1-10;**                      **DEFENDANTS**

*Plaintiff demands a jury trial.*

## COMPLAINT

NOW COMES Plaintiff J.H., by and through her attorneys, PAUL BYRD LAW FIRM, PLLC, and for her Complaint against Defendants CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; and JOHN DOE DEFENDANTS 1-10, hereby states as follows:

## INTRODUCTION

1.  Known pedophiles should not be given access to children. Yet, that is exactly what Defendants did in this case. They gave a convicted child rapist a position of authority in the Church of Jesus Christ of Latter-day Saints (commonly known as the Mormon Church) and allowed him to interact regularly with the children of the Pinnacle Mountain Ward LDS Church. The results were horrific.



2.      For nearly twelve years, from the time she was just four years old until she was fifteen, J.H. endured pervasive sexual abuse at the hands of her stepfather, G.S[1]. The abuse was relentless and devastating—occurring at least weekly in her own home, it robbed her of her childhood, her sense of safety, and her trust in those who should have protected her. When she finally found the courage to disclose the abuse at age fifteen, instead of receiving support and protection, she was subjected to further trauma by the very institution that should have stood by her: Pinnacle Mountain Ward of the Church of Jesus Christ of Latter-day Saints in Little Rock, Arkansas.

3.      G.S. was a Priesthood Holder in the LDS Church—a position of spiritual authority and trust within the Mormon community. When J.H. disclosed the years of sexual abuse to authorities in 1993, resulting in criminal charges against G.S. , the Church had a moral and legal duty to protect her. Instead, Church leaders at Pinnacle Mountain Ward subjected her to interrogation and blame.

4.      In a meeting with the Bishop and counselors, J.H. was questioned about the abuse while her stepfather claimed she had seduced him. Rather than protecting a traumatized child, Church leaders implied she was responsible for her own victimization and stated they would wait to see how the criminal charges played out before taking any action.

5.      The Church's betrayal continued. Despite knowing about the pending criminal charges, Church officials allowed G.S. to give public testimony in which he asked for forgiveness from his family and daughter—forcing J.H. to sit through her abuser's performance of contrition. When she was placed in foster care with another Mormon family at her mother's request, the Church failed to protect her from continued exposure to her abuser. She was required to attend

---

[1] Plaintiff uses initials for the perpetrator to avoid publicly identifying a non-party in connection with allegations of child sex abuse but will provide such information pursuant to a protective order.

2

services at the same church where G.S. was present, seeing him every Sunday with no supervision or protection. Other families and children in the congregation were never warned about his charges or the danger he posed.

6.      In 1993, G.S. pled guilty to sexual abuse of a minor in the third degree. Yet throughout the investigation and prosecution, the Church prioritized protecting its own reputation over protecting an innocent child. The devastating impact of both the abuse and the Church's institutional betrayal has left J.H. with profound and lasting psychological wounds. She has been diagnosed with PTSD and depression, has struggled to trust therapists after early negative experiences, and has faced immense challenges in forming healthy relationships. She dropped out of high school and as a teenager became pregnant, feeling pressured to place her child for adoption with a Mormon family.

7.      Plaintiff brings this cause under Arkansas state law, seeking compensation for the devastating damages caused by Defendants' acts and omissions, for negligence, and for punitive damages seeking to deter other institutions from engaging in similarly shocking and reprehensible conduct.

## PARTIES, JURISDICTION, AND VENUE

### A.    Plaintiff

8.      "J.H." is a pseudonym used to protect the anonymity of the Plaintiff.

9.      As a minor at the time of the events described herein, J.H. qualifies as a "Vulnerable Victim" pursuant to A.C.A. § 16-118-118(a)(6).

10.     Plaintiff J.H., age four to fifteen when she was abused, is an adult female at the time of this filing and a resident of Pulaski County, Arkansas.

3

11.    At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff J.H. was an unemancipated minor residing in Pulaski County, Arkansas.

12.    The sexual abuse and molestation by G.S. caused Plaintiff profound and enduring harm, including significant emotional distress, psychological trauma, and mental anguish. The abuse has caused Plaintiff to lose her sense of trust, safety, and personal security, depriving her of the opportunity for normal and healthy development. The injuries Plaintiff sustained are severe, ongoing, and permanent, affecting her emotional and psychological health in lasting and immeasurable ways.

13.    Plaintiff's full identity has been withheld from public court filings to prevent those not directly involved in this action from learning her identity and making it public, as such a public disclosure would further harm Plaintiff and her family.

**B.    Defendants**

14.    Defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints and Successors ("COP LDS") is and was at all relevant times mentioned herein, a foreign religious corporation of the LDS Church registered to conduct business in Arkansas.

15.    COP LDS is a corporation duly organized and operating pursuant to the laws of the State of Utah. COP LDS's principal place of business is 50 East North Temple, Floor 20, Salt Lake City, State of Utah 84150. COP LDS operates wards, meetinghouses, congregations, temples, and other houses of worship within the State of Arkansas and other states. COP LDS does business with and conducts continuous and systematic activities in Arkansas. The divisions of the COP LDS are the Wards, Stakes, and Areas. COP LDS is independently liable for its own conduct as alleged herein, is liable as a successor in interest to another entity, and/or is an alter ego of the other Defendants.

16.    At all relevant times, Defendant Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints ("Bishop LDS") was a foreign religious corporation sole incorporated in the State of Utah that was registered to conduct business in the State of Arkansas.

17.    At all relevant times, Defendant Pinnacle Mountain Ward of the Church of Jesus Christ of Latter-day Saints, Little Rock, Arkansas ("Pinnacle Mountain Ward") was an unincorporated entity that conducted business in the State of Arkansas and was part of the larger Church organization operating in Arkansas and throughout the United States.

18.    To the extent that Pinnacle Mountain Ward was a different entity, corporation, or organization during the period of time in which G.S. used his position to sexually abuse Plaintiff, such entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit.

19.    To the extent that Pinnacle Mountain Ward is a successor to a different entity, corporation, or organization that existed during the period of time during which G.S. used his position to sexually abuse Plaintiff, such predecessor entity, corporation, or organization is hereby on notice that it is intended to be a defendant in this lawsuit.

20.    All such Pinnacle Mountain Ward-related entities, corporations, or organizations are collectively identified and referred to herein as "Pinnacle Mountain Ward."

21.    Various individuals and entities not named as defendants herein, John Doe Defendants 1-10, may have directly participated in the tortious conduct alleged herein, may have performed acts and made statements in furtherance thereof, or omissions, which contributed to or caused the tortious acts and resulting damages outlined in this Complaint. These various individuals and entities may be, without limitation, employees, agents, affiliates, alter-egos, partners, joint-ventures, parent organizations, subsidiaries, or insurance carriers of the named

defendants. Each of the John Doe unknown tortfeasors may have performed each of the acts alleged herein, or alternatively, each of the John Doe unknown tortfeasors may have authorized or ordered duly authorized officers, agents, employees, or representatives to perform said acts.

22.    To the extent that such John Doe tortfeasors are liable for some or all of Plaintiff's damages, the identity of said tortfeasors has not been determined as of this date and it is necessary to conduct discovery to determine the identity of said tortfeasors. If a John Doe Tortfeasor is identified for one or more of the causes of action listed below, Plaintiff will amend this Complaint accordingly.

23.    Given their relationship, Bishop LDS, COP LDS, and John Doe Defendants 1-10[2] are collectively referred to below as "LDS," "LDS Church," "Church Defendants," or "Defendants."

24.    As part of its religious mission, the Church authorized and selected leaders to administer geographic areas known as Stakes and sub-units of Stakes known as Wards. Ward and Stake leaders were at all times relevant to this complaint acting as agents of the Church.

25.    The LDS Church is the religious entity through which G.S. held and used his position as a trusted Priesthood Holder to maintain authority over and access to Plaintiff, and through which Church officials subjected Plaintiff to interrogation, blame, and continued exposure to her abuser after she disclosed the abuse.

26.    Defendants each assumed responsibility for their members, prospective members, and invitees. This relationship gave rise to a duty to protect members, prospective members, and invitees of the congregation, including the minor Plaintiff from a foreseeable risk of harm.

_____

[2] Pursuant to John Doe Affidavit

6

27.    Each Defendant is responsible, in some manner, for the events and happenings herein referred to, thereby legally causing the injuries and damages to Plaintiff as hereinafter alleged.

## JURISDICTION & VENUE

28.    This Court has subject matter jurisdiction pursuant to AR Code § 16-13-201.

29.    Venue is proper in this Court under AR Code § 16-60-101 because the tortious conduct described herein occurred within Pulaski County, Arkansas.

## STATUTE OF LIMITATIONS

30.    Plaintiff's claims are timely under the Justice for Vulnerable Victims of Sexual Abuse Act, codified at Ark. Code Ann. § 16-118-118.

31.    Alternatively, Plaintiff's claims are timely pursuant to the Arkansas delayed discovery statute, codified at Ark. Code Ann. § 16-56-130.

32.    Plaintiff J.H.'s claims are timely under the Delayed Discovery Act, as follows:

A.    Plaintiff was born in 1977. Plaintiff was abused from approximately 1981 through 1993, from approximately age four through age fifteen.

B.    Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.    Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because psychological conditions arising from the abuse themselves prevented that discovery.

D.    These conditions may include but are not limited to: post-traumatic stress disorder, depression, anxiety, and substance abuse disorder. These conditions

7

commonly prevent victims of child sexual abuse from discovering the effect of the injuries until well into adulthood.

E.      One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F.      Plaintiff was not afforded any adequate counseling specifically related to the childhood sexual abuse she experienced. Her early therapeutic experiences were negative and left her distrusting of therapists for many years.

G.      In approximately 2022 or 2023, Plaintiff began to reflect on the reasons for her ongoing struggles and determined that they were the result of being abused while the Church failed to protect her.

H.      Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130. Moreover, Plaintiff exercised reasonable diligence under the circumstances once discovery was possible.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    The Abuse

33.     Beginning when J.H. was just four years old in approximately 1981, her stepfather G.S. began sexually abusing her. The abuse was pervasive, relentless, and devastating. It occurred consistently in her own home. The abuse continued until she was fifteen years old in 1993—nearly twelve years of sustained trauma.

34.     The abuse was frequent and varied. It occurred at least once a week, though often more frequently. By the time J.H. reached grade school age, G.S. forced her to come to his

bedroom each night to massage him until he fell asleep. During these massages, G.S. would escalate to other sexual assaults and indecent acts.

35.    The specific acts of abuse were horrific and numerous. G.S. touched J.H.'s vagina, including digital penetration. He made her touch his penis. He touched her breasts. He forced her to shower with him and forced her to bathe him. When her mother was out of town, G.S. made J.H. sleep in his bed with him.

36.    The psychological impact of this sustained abuse was profound. G.S. exploited J.H.'s vulnerable position as a child dependent on him for her basic needs. He used his position of authority as her stepfather and as a Priesthood Holder in the Church to maintain control over her.

**B.    Disclosure and Criminal Proceedings**

37.    At age fifteen, J.H. finally found the courage to disclose the abuse. She told her boyfriend, who told his mother, who immediately called J.H.'s school.

38.    The next day, J.H. was called in to see the school counselor at Joe T. Robinson Junior High in Little Rock, Arkansas. The counselor notified the Arkansas Department of Human Services (ADHS). Social workers became involved and detectives investigated the case for the Little Rock Police Department in Pulaski County, Arkansas.

39.    In 1993, G.S. pled guilty to sexual abuse of a minor in the third degree.

**C.    The Church's Response and Institutional Betrayal**

40.    When J.H. disclosed the abuse and criminal charges were filed against G.S., J.H.'s mother made the Bishop and the 1st and 2nd counselors of Pinnacle Mountain Ward aware of his charges.

41.    The Bishopric held a meeting with J.H., her mother, and a few other Priesthood Holders. In this meeting, J.H.—a traumatized fifteen-year-old victim of twelve years of sexual

9

abuse—was questioned and interrogated about what had happened to her. Her stepfather told the Church leaders that she had seduced him. The Church leaders implied the same—suggesting that a child who had been abused since age four was somehow responsible for her own victimization.

42.    The Church's failure to protect J.H. continued. G.S. gave public testimony during a church service in which he asked for forgiveness from his family and daughter. J.H. was forced to sit through her abuser's public performance of contrition, re-traumatizing her in front of the entire congregation.

43.    After disclosure, J.H. was placed in foster care with another Mormon family. J.H. saw her stepfather at church every Sunday. She was not supervised or protected from him during these times. Other families and children in the congregation were not made aware of his pending criminal charges or the danger he posed.

44.    J.H.'s foster mother shared everything with J.H.'s mother and stepfather, further compromising J.H.'s safety and privacy. At one point, G.S. himself began treating with the same therapist to whom J.H.'s foster mother had brought her for therapy. As a result, that therapist dropped J.H. as a client.

45.    J.H. also received court-ordered treatment from another psychologist who laughed at her as she described the abuse she had endured. These failures left J.H. distrusting of therapists for many years.

46.    G.S.'s family pressured J.H. to say she made everything up and to drop the charges. The Church's failure to protect J.H. enabled this family pressure campaign designed to silence her and protect her abuser.

47.    J.H. was in foster care for eight to nine months. Her mother eventually left G.S., and J.H. was returned to her mother's custody by the state.

**D.   Damages and Long-Term Impact**

48.   The devastating abuse by G.S., compounded by the institutional betrayal by Pinnacle Mountain Ward, has left J.H. with profound and lasting psychological wounds. She has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and depression.

49.   Due to her negative early experiences with therapists, J.H. was distrusting of therapists for many years. It was only as an adult that she finally sought treatment on her own. From 2019 to 2022, she also received stellate ganglion block (SGB) injections every two to four months for her PTSD.

50.   The abuse has impacted J.H.'s entire life trajectory. She dropped out of high school. She had a teenage pregnancy in 1995 and placed the child for adoption with a Mormon family. She has had many dysfunctional relationships with men, struggling to form healthy attachments.

51.   The impact extends far beyond J.H. herself. Upon information and belief, G.S. abused multiple other minors, including members of Plaintiff's immediate family, demonstrating a pattern of predatory conduct that Defendants failed to interrupt.. Upon information and belief, G.S.  also previously abused his own cousin, who has Down Syndrome. The Church's failure to protect children and warn potential victims enabled G.S.  to victimize multiple children over many years.

**E.   Church Knowledge and Institutional Patterns**

52.   Each Stake creates and maintains meticulous sets of membership records which are reviewed and controlled by Defendants. Records with "annotations" are maintained where a member's conduct has threatened the well-being of other persons, including for sexual offenses against children.

53.    Defendants maintain a pattern and practice of concealing abuse from the authorities and signaling that its members should conceal and/or fail to report abuse. Through this policy of concealment, the Defendants ratify abusive conduct.

54.    After being informed in 1993 of the criminal charges against G.S. for sexually abusing his stepdaughter, Defendants knew or should have known that allowing him to continue participating in Church services where J.H. was present, without supervision or protection, presented a risk of imminent harm to her psychological well-being.

**F.    Defendants' Failures**

55.    Defendants are liable to Plaintiff for harm from the sexual assault, abuse, and other misconduct committed by G.S. because, inter alia, the Defendants:

      a.    Breached their duty to implement and enforce adequate policies, guidelines, training, education, and procedures aimed at preventing, deterring, uncovering, and reporting instances of child sexual assault and/or abuse by members, including Priesthood Holders.

      b.    Negligently and/or intentionally failed to protect Plaintiff after they were informed of the abuse and pending criminal charges.

      c.    Failed to protect Plaintiff from continued exposure to her abuser after being informed of the abuse and criminal charges.

56.    Defendants also intentionally and willfully implemented various measures that perpetuated the harm to Plaintiff, including:

      a.    Permitting G.S. continued access to Plaintiff and the congregation after Defendants knew of the criminal charges against him.

b.      Failing to inform other families and children in the congregation of the danger posed by G.S..

c.      Subjecting Plaintiff to interrogation and blame, implying she bore responsibility for her own victimization.

d.      Allowing G.S. to give public testimony asking for forgiveness while forcing Plaintiff to be present.

e.      Failing to supervise or protect Plaintiff during church services when she was in foster care.

f.      Failing to implement reasonable policies and safeguards to respond appropriately to disclosures of childhood sexual abuse.

57.     Defendants' failure and/or refusal to satisfy their duties to Plaintiff was a part of Defendants' intended plan to conceal wrongful acts, to avoid scandal, and to preserve a false appearance of propriety.

58.     Such actions were motivated by a desire to protect the reputation of Defendants while fostering an environment where victims are blamed and abusers are protected.

59.     The wrongful, intentional, negligent acts and/or omissions of Defendants was a legal cause of the exacerbation of harm that caused injuries to Plaintiff.

## CAUSES OF ACTION

### COUNT ONE – NEGLIGENCE

(Plaintiff Against All Defendants)

60.     Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

13

61.     At all times relevant hereto, Defendants owed a duty of care to Plaintiff by virtue of the special relationship existing between the Church and its members—particularly minor children who look to Church leaders for spiritual guidance and protection.

62.     Upon receiving actual notice in 1993 of the abuse and criminal charges against G.S. , Defendants assumed a duty to exercise reasonable care to protect Plaintiff from foreseeable harm.

63.     Defendants breached their duties of care by failing to take any reasonable preventive action to protect Plaintiff; failing to implement reasonable supervision; failing to warn families of the danger; subjecting Plaintiff to interrogation and blame; and otherwise failing to exercise reasonable care.

64.     As a direct and proximate result of Defendants' negligence, Plaintiff suffered additional psychological harm, was subjected to ongoing contact with her abuser, was blamed for her own victimization, and was denied the protection to which she was entitled.

65.     As a direct and proximate result of Defendants' negligent conduct, Plaintiff has suffered severe and permanent injuries including physical and mental pain and suffering, PTSD, depression, anxiety, and other consequential damages.

## COUNT TWO – NEGLIGENT SUPERVISION

### (Plaintiff Against All Defendants)

66.     Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

67.     Negligent supervision hinges on the element of foreseeability. *See Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.*, 345 Ark. 555, 568, 49 S.W.3d 107, 115 (2001). The continued harm and re-traumatization of Plaintiff was foreseeable to Defendants.

14

68.    Defendants were fully aware of the criminal charges against G.S. for sexually abusing Plaintiff, yet they made the conscious decision to allow him continued access to Plaintiff at Church services without supervision or protection.

69.    This negligent supervision was the proximate cause of Plaintiff's injuries.

70.    Defendants also failed to inform, educate, or train its leaders in how to respond to incidents of child sexual abuse; warn members about this known danger; or implement reasonable child abuse prevention policies.

## COUNT THREE – NEGLIGENT PATIENT CARE

### (Plaintiff Against All Defendants)

71.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

72.    At all relevant times, Defendants had a duty to supervise Plaintiff, and the other minor members in their care, as described herein.

73.    Arkansas courts recognize negligent care claims where an institution undertakes responsibility for the supervision and protection of a vulnerable person, regardless of medical status. Indeed, the theory of negligent patient care hinges on the relationship between the care provider and the person under their care. *See Regions Bank & Tr. v. Stone Cty. Skilled Nursing Facility, Inc.,* 345 Ark. 555, 564, 49 S.W.3d 107, 112-113 (2001). Defendants, as a religious institution providing spiritual guidance and pastoral care to minors, had a duty to supervise Plaintiff and all other minors in their care.

74.    A care provider is required to consider the person's capacity to care for himself or herself and to protect the person from dangers created by his or her vulnerable condition. Providing a safe environment for congregants is within the scope of the services of an institution like

Defendants. *See Sexton v. St. Paul Fire & Marine Ins., Co.* 275 Ark. 361, 631 S.W.2d 270 (1982). Arranging for a safe environment for members of a religious congregation is well within the scope of Defendants' services. Therefore, Defendants were required to take Plaintiff's capacity as a minor child to care for herself into account in their supervisory capacity.

75. At all times relevant hereto, Defendants represented themselves as a religious institution providing spiritual guidance, pastoral care, and counseling to their members, including minors.

76. At all times relevant hereto, it was within the scope of Defendants' services to provide a safe environment for the minor members in their care.

77. At all times relevant hereto, Defendants failed to investigate complaints of sexual abuse made by Plaintiff against G.S., thereby failing to provide a safe environment for the children in their care.

78. At all times relevant hereto, Defendants, through their agents and employees, were aware of the sexual abuse and exploitation Plaintiff was experiencing.

79. Defendants' failure to provide a safe environment for the children in their care was the proximate cause of Plaintiff's injuries.

80. For the reasons described throughout this Complaint, Defendants' failure to provide a safe environment for the minors in their care was negligent and a proximate cause of Plaintiff's injuries.

**COUNT FOUR – BREACH OF FIDUCIARY DUTY**

(Plaintiff Against All Defendants)

81. Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

16

82.    At all times relevant hereto, a fiduciary relationship existed between Defendants and Plaintiff, a minor child member of their congregation. This fiduciary relationship arose from Defendants' assumption of spiritual authority, counseling responsibility, and disciplinary control over Plaintiff and her family. Defendants assumed duties of trust, confidence, and protection toward Plaintiff.

83.    Defendants breached their fiduciary duties to Plaintiff by failing to protect Plaintiff after learning of the abuse; subjecting Plaintiff to interrogation and blame; permitting Plaintiff's continued exposure to her abuser; failing to warn other families; and prioritizing protection of institutional reputation over the safety of a child victim.

84.    Defendants ratified G.S.'s abuse of Plaintiff. In 1993, Defendants had actual knowledge that G.S. had harmed Plaintiff. Despite this knowledge, Defendants blamed the victim and failed to take any action to protect Plaintiff. By failing to discipline or distance G.S. from the congregation, they accepted and thereby ratified his conduct.

85.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiff has suffered severe and permanent injuries and damages.

## COUNT FIVE – VICARIOUS LIABILITY FOR NEGLIGENT OR OTHERWISE TORTIOUS ACTS AND OMISSIONS OF ALL AGENTS AND EMPLOYEES

### (Plaintiff Against All Defendants)

86.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

87.    Defendants are vicariously liable for all acts and omissions of their agents and employees, including but not limited to the Bishop, Stake President, counselors, Priesthood

Holders, and other Church officials, as well as those as of yet unknown agents and employees, as described throughout this Complaint.

88.    As described herein, the known and unknown Defendants' agents, employees, and representatives were all acting within the scope of their authority and employment when these breaches of duty occurred.

89.    At all times relevant, Defendants' employees and agents staffed and operated the religious programs, pastoral care, and counseling services. In doing so, Defendants' agents and employees were required and authorized as part of their agency duties to interact with, mentor, supervise, and provide spiritual guidance to members participating in the programs, including Plaintiff.

90.    All agents and employees of Defendants were charged with, among other tasks, the supervision and care of the members, including Plaintiff.

91.    Defendants had a duty to supervise their agents and employees during their respective service with Defendants.

92.    At all times relevant, the agents and employees of Defendants were empowered by Defendants to run and operate the Church. In doing so, they were expected to interact with, mentor, supervise, and oversee the members, including Plaintiff.

93.    The agents and employees of Defendants used their positions of power and authority vested in them by Defendants when they failed to protect Plaintiff and subjected her to interrogation and blame following her disclosure of abuse.

## COUNT SIX – TORT OF OUTRAGE / INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Plaintiff Against All Defendants)

18

94.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

95.    Defendants willfully and wantonly engaged in extreme and outrageous conduct.

96.    Defendants occupied a position of trust and authority over Plaintiff. Defendants knew or should have known of Plaintiff's special susceptibility to emotional distress due to her age and vulnerability as a victim of sustained childhood sexual abuse.

97.    In 1993, Defendants received actual knowledge of the criminal charges against G.S. . Despite this knowledge, Defendants intentionally engaged in extreme and outrageous conduct by subjecting Plaintiff to interrogation in which she was blamed; permitting G.S. to deliver public testimony in Plaintiff's presence; allowing Plaintiff's continued exposure to her abuser; and failing to provide appropriate support or protection.

98.    Defendants' conduct was extreme and outrageous and exceeded all bounds of decency tolerated in a civilized society.

99.    Defendants' conduct proximately caused the injuries to Plaintiff.

## COUNT SEVEN – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Plaintiff Against All Defendants)

100.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

101.    Defendants' negligent acts and omissions exposed Plaintiff to emotional injuries from the institutional betrayal and re-traumatization by Defendants after she disclosed the abuse.

102.    As a direct and proximate result, Plaintiff has suffered and will continue to suffer physical and emotional injuries.

## DAMAGES

19

103.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

104.    As a direct result of Defendants' conduct, Plaintiff has suffered severe psychological harm and re-traumatization, causing severe and permanent injuries including:

    a.    Severe pain and suffering, including emotional distress and mental anguish, past and future;

    b.    Severe and permanent psychological injuries, including depression, PTSD, anxiety disorders, loss of self-esteem, shame, and humiliation;

    c.    Past and future medical expenses; and

    d.    Past and future lost wages and loss of earning capacity.

105.    Plaintiff was prevented and will continue to be prevented from obtaining the full enjoyment of life.

## PUNITIVE DAMAGES

106.    Plaintiff hereby incorporates by reference all previous paragraphs as if fully set forth herein.

107.    Defendants knew that G.S. presented an unreasonably high risk of harm to Plaintiff. Defendants consciously made the decision not to act. Defendants knew that their refusal to take any steps to protect Plaintiff would result in continued psychological harm.

108.    Defendants made the calculated decision to blame the victim, allow the abuser continued access to her, force her to face her abuser weekly at Church services, and engage in misconduct undertaken with conscious indifference to the probability of causing severe emotional distress to a child victim. Therefore, Defendants' conduct was willful and wanton, and in reckless disregard of the consequences.

109.    Defendants displayed a conscious indifference to the rights, safety, and welfare of Plaintiff, and they should be punished to the fullest extent possible under the law.

110.    Pursuant to Ark. Code Ann. § 16-55-206, Plaintiff provides notice of her intent to seek punitive damages against all Defendants.

## JURY DEMAND

111.    Plaintiff respectfully demands a trial by jury as to all matters so triable.

## RESERVATION OF ADDITIONAL CLAIMS

112.    Plaintiff reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that a verdict or judgment is entered in her favor on all counts alleged, and against each and every named Defendant, and that damages are awarded to her in an amount which will adequately compensate Plaintiff for the severe and permanent injuries and damages she sustained, as well as award punitive damages against Defendants. Plaintiff is seeking recovery for:

    a.    All available compensatory damages;

    b.    Past and future medical expenses;

    c.    Past and future lost wages and loss of earning capacity;

    d.    Past and future emotional distress;

    e.    Consequential and/or special damages;

    f.    All available noneconomic damages, including pain, suffering, and loss of enjoyment of life;

21

g.   Punitive damages;

h.   Attorneys' fees and case costs;

i.   Pre- and post-judgment interest; and

j.   All other damages and compensation available under state and federal law.


Dated: January 30, 2026


Respectfully Submitted,
**PAUL BYRD LAW FIRM**
415 N. McKinley St., Suite 210
Little Rock, AR 72205
Phone: (501) 420-3050
Fax: (501) 420-3128
paul@paulbyrdlawfirm.com

By:   */s/ Paul Byrd*


**COUNSEL FOR PLAINTIFF**


22